Our second case of the morning is Inessa Bakyukova v. Doege. I probably mispronounced both. I wonder if I'll get counsel's name right. Mr. Radner, you get to go first. Good morning, your honor. Thank you very much. This case creates a very simple question, and that is, what exactly did my client do that the defendant Doege could have observed that would justify and make it reasonable for him to try to kill her? That's the ultimate question here. There has to be something we can point to that my client did or said that makes it reasonable for the defendant in this case to try to kill her. And I asked him that during his deposition, and his answer was she reached, and she made two specific threatening statements. The fact that she reached is deemed admitted, and that's fine, and it's very possible that she did. So let's just not dispute that. She reached. But what did she reach for? The exact request to admit is, admit that you reached your hands toward the waistband of your pants. Not in, not in a pocket. Your hand doesn't disappear. It goes toward your waistband. And that's why I asked him. I said, that alone, that's enough? And on page six and seven of his transcript, he explains that my client also said two more things. Death to America, and pardon my French, you're going to effing die tonight. She never said those things. And it's clear on the recordings that she never said those things. But more importantly, this appeal, for purposes of what the facts are, have to be in the light most favorable to the plaintiff. So my client denies ever saying that. So- You would agree, wouldn't you, that she came toward him in a very aggressive manner, screaming obscenities, like a, you know, like a wild woman when you look at the video. So you would agree with that, right? Absolutely. She absolutely did. And she shouldn't have done that. You're not supposed to yell and scream obscenities. But does that warrant getting killed? What did she do that threatened him? Well, that might, that might, that might add to reaching behind your, what, to get, get to your waistband if somebody is coming at you very aggressively, and you back up to get away from them, and they still get, still come. Okay, so- Let me ask you, Mr. Radner, to include in that, isn't there also evidence, undisputed, is maybe where you'll catch me on this, that she had refused at least once to obey this deputy's commands that would have kept her in place, and she kept coming towards him? Yeah, she, she disobeyed lots of commands. And I mean, why are police just allowed to come over to you and start giving you commands? He claims, and again, his testimony is that this stop was to render aid, not to arrest her, not to detain her, to render aid. He has a very interesting way of rendering aid. He pulls up and starts yelling orders, show me your hands, pulls his gun out. She starts walking towards him. She's holding a cigarette. She's clearly not well. You could tell by listening to the video. There's some, there's, again, there's some screws loose. It's pretty clear. But at what point does she do something that says, you now get to kill me? And you know what, let's, let's do a little bit of a, let's do this exercise. Let's pretend like Dogi didn't have a badge. Do we still think it's reasonable for somebody to try to kill a woman who's walking towards you, disobeying orders, and reaching towards her waistband? You don't see a deadly weapon. You have no idea if she's got a weapon. She, her hand doesn't even disappear. It just goes towards the waistband of her pants, towards it. That's it. Nothing else. Your thought experiment seems to go against an awful lot of case law that says law enforcement officers who are reasonably in fear that somebody is reaching for a weapon. And the context for that is widely varying. I mean, I hear you, but I'm not sure that takes you very far. Well, and that's why what you just said is in every drop of case law, reasonably, there has to be a reasonableness test. If it's reasonable for a law enforcement officer, it's the same test that you and I would have if we use force. If we're scared for our lives and use a firearm and shoot somebody repeatedly, and let's say kill them or not kill them, let's say kill them because there's no question he was trying to kill her. When you shoot somebody that many times, that's the only thing you can be trying to do. So somebody walks you, you pull out, you're going to start emptying the clip. Would that really be reasonable? At the end of the day, this is a qualified immunity appeal. So it comes down to what's clearly established for you to get a reversal here. What case do you think is the best case, clearly establishing that, I know it's not going to be identical, but this general factual scenario is a constitutional violation that would get you over the qualified immunity hurdle. I think Hank versus Rogers is, I mean, we can go from a higher level, Graham and then Tennessee v. Garner, which actually requires a verbal warning if feasible. And when he's behind his car and has his gun drawn, why can't he say, freeze or I'll shoot, drop your hands or I'll shoot? He never says a warning, even though the Supreme Court said he has to. But I think Hank versus Rogers, 853 F3D 739 at 747, it's a 5th Circuit 2017 case. Hank versus Rogers, page 747. Whereas here, an individual stopped for a minor traffic offense, offers at most passive resistance and presents no threat or flight risk, abrupt application of physical force rather than continued verbal negotiating is clearly unreasonable and excessive. Not even might be reasonable, is clearly unreasonable. I'll look at that case. Was there a hand movement in that case? I don't believe there was a hand movement, but if that's really, I mean, I guess that ultimately is the question before the court, which again, has to fall into the reasonableness case law that's established in this court, which is, is that enough? Is reaching for your waistband and nothing else? And remember, the officer testified that reaching wasn't enough. It was the reaching in conjunction with two very threatening statements, which she did not make. Death to Hank and die tonight. Those are not in the recording. And she never said it. She denies saying it. It's in her transcript and it's in the recording that she never said it. Yet that's what he testified to. His own testimony. And he doesn't have all the brilliant legal scholar that the defense attorney has and knows how to argue exactly what his client really was thinking at the time. But I asked him explicitly under oath, why did you shoot her? What were you scared of? And it was the reaching in conjunction with two threatening statements that he never made, that she never made. So without those threatening statements, and I understand, um, judge Southwick and judge Davis, you both asked me about this when you reach and you're not listening and you're walking towards him. Yeah, that could be viewed as, as I guess that could be viewed as, as passive resistance, but enough to use deadly force. Is that really what expect from our police officers? I think they should be held to a higher standard than you and I. Yet, if you and I did this, we'd be in prison. Qualified immunity does come into play obviously, but so does reasonableness. And what we've completely lost in the weeds and I think all over the country is reasonableness. We just accept that, that when officers use an extreme level of and why I actually argued this and Mr. Green pointed out that the police officers have an obligation to protect us and that's why they get this heightened protection. But no, they don't have an obligation to protect us. They don't have an obligation to do anything for us. That's also something that the courts have made abundantly clear. They don't have to protect us. They don't have to protect our kids while in school. Even if an officer is appointed to that at what point do we say you are going to have to start using some reasonableness? What's the point about the schools? I guess I lost you there. That's just, I'm talking about what it is that law enforcement does have to do, which is literally nothing and the protection that they get. The school was a reference to the Parkland school shooting where there was a police officer assigned to a school and even in that case, there's no obligation to protect them. So what is it that the police, do have to do for us? What obligation do they have to us that warrants this extremely high level of protection that when they kill us, we can't even sue them. There has to be a reasonableness test here. There has to be. This has to stop. And I know I've answered your questions. I'm not going to continue to beat a dead horse. I think Hank versus Rogers is on point. I think the Amador versus Vasquez case is on point. Trammell versus Fuge is on point. Unless there's specific questions for me from the panel, I can reserve the rest of my time and pass to Mr. Grant. I do have one question about something we haven't talked about, the First Amendment claim. Yes. You said correctly that there's a factual dispute about whether the, what she said at the end before she was shot. And you correctly said that because there's a dispute in looking at the excessive force, we have to take your client's version of the facts, which is that she didn't say those things. But it seems like your First Amendment retaliation claim depends on her saying those things. So it's just, it's just an unusual posture where you want us to consider the facts for one claim, but not for the other. I'm just trying to think how that, shakes out, if you can help with that. Thank you, Mr. Costa, for bringing that up. I actually had a note to address that. And thank you for reminding me. What my client did say was F you, F America. I hate America. She said F you several times. She shouted F you at him. She gave him the finger. That is protective free speech. And that you can hear on the recording. And she admits doing those things. Okay. So your, your First Amendment claim is on the, those accepted statements. I'll call them agreed statements. Yes. Your First Amendment claim is not based on the statements that you claim she, she claims she never made. No. In fact, I mean, I like to dig myself even deeper. So I'll go so far as to say, if she would have said, you're going to F-ing die tonight, as she reaches into towards her waistband, we got a qualified immunity issue there. But she never did that. And that's actually, I think, why the officer, pardon, pardon my bluntness, lied in his report and lied under oath and said that she did say those things to justify his actions. But we have a recording and he, she never said those things. She just didn't. And his own testimony is that it was those, those threatening statements, not offensive statements, but threatening statements in conjunction with reaching that made him fearful for his life. I guess that's it. That's it, Mr. Green. Good morning, Your Honors. My name is Robert Green. I'm here for the appellee in this case, Brandon Daigie. And the first point that I'd like to review is the relevance of Deputy Daigie's motivation as he testified to in his deposition for his use of deadly force. My opposing counsel opened his argument with a review of some of that testimony. But this court's deadly force and Fourth Amendment excessive force cases are clear that the analysis of reasonableness needs to be undertaken from the perspective of a hypothetical reasonableness, reasonable officer. It's an objective test. And so, Deputy Daigie's subjective motivation, as can be gleaned from his deposition testimony, to the extent that it can be, is not what informs the assessment of reasonableness for this case. It is a reasonableness standard that governs the use of deadly force. And this court's cases are clear about how that reasonableness standard applies in this type of case. And this court's been consistent since at least the Young case in 1985. The standard that's relevant is that it's reasonable for an officer to use deadly force if the officer has a reasonable belief that the subject of that force poses a threat of serious harm. And furthermore, there is such a reasonable belief when a non-cooperative subject makes a movement that is consistent with reaching for a line of sight. What would you say, Mr. Green, is undisputed about the actions, factually undisputed about the actions, right before she was shot? Yes, Your Honor. So, at the opening of the encounter, I don't believe there is any dispute in the record that Deputy Daigie, when he saw Ms. Fachikova begin to exit her vehicle, he issued a number of instructions to her. He first asked her to finish getting out of the vehicle. He then instructed her to show her hands and to place her hands on her vehicle. It is not disputed that she did not comply with those instructions. It's also not disputed that instead of complying, she began to shout angrily at Deputy Daigie, and I believe we've already reviewed some of the things that she shouted. It is also not disputed, and can be seen on the video, that within about 15 or 20 seconds of exiting her vehicle, she began to walk towards Deputy Daigie. She testified in her deposition that as she did this, she was still shouting obscenities. She had her middle fingers raised and extended towards him. It's also undisputed that as she walked toward him, Deputy Daigie issued additional instructions. Once she had walked behind her vehicle, he asked her, what is going on, ma'am? He instructed her to place her hands on her head. She did not comply with those instructions. He got back into his vehicle and began to back away from him. And some important context for all of this is that this encounter occurred to begin with because he came upon her vehicle stopped shortly before midnight in an active traffic lane on Highway 90. So it was dark. They were in an active traffic lane of a two-lane highway, and he began to back away from her, and then stopped his vehicle, got out, and again instructed her to show her hands. At that point... Let me ask you about the headlights of his I think essential to your client's qualified immunity, right, or absence of one. How visible was she? Is that part of the factual record? So I don't believe that there was deposition testimony to that point, but it is, I think, clear from the video that his headlights were on and that she was illuminated by his headlights as she was in front of his vehicle. The video, I must say, a lot of it's not clear, but the lights being on and she's the only person particularly visible most of the time. But I don't know if he's indicating... I mean, part of the case law talks about what the person was wearing when they're reaching, how reasonable was it for the officer not to fear that there might be a weapon. I don't know how well, what the record shows about how well your client could see her clothing, could see whether there was a possibility of a weapon being hidden. Yeah, now I will point out, I think we've covered that there's a deemed admission as to the fact that Ms. Pachikova reached for her waistband. There is also testimony that Deputy Dayton gave, which is not contradicted by any other evidence, that he saw one hand disappear behind her back. And there was also deposition testimony to the effect that her other hand may have been holding a cigarette and that at some point before the shooting, she spit and then flicked the cigarette towards him. So at least one hand would have remained visible, but it's undisputed that her other hand went behind her back and that that was what happened in the moments immediately before he fired. I'd also like to point... of our recent en banc decision in Cole versus Carson, about the need where feasible for a warning before using deadly force. Absolutely. That's actually a subject that was covered in the the sir reply brief that Applee filed in this case. It's an argument that appellant raised in in her reply brief. And I think what's significant about that is that this court's cases have made clear that the sequence of events that occurred here in which Deputy Dayton repeatedly issued instructions and then when she refused to comply with those instructions, drew his weapon and crouched behind the door of his vehicle, that itself was a communication. It was effectively a warning that he believed the use of deadly force might be necessary. Now at the point when... the warning was never drop, you know, put your hands up or I'm going to shoot, drop it or I'm going to shoot. It was never... there were a number of commands for sure, but did it have to be more more explicit than that? An actual warning about using force? No, it doesn't need to be more explicit than that. And again, the requirement that's set forth in Varner is that the warning must be given where feasible. And I think that interrelates with the analysis of the point at which using deadly force became reasonable, which is explored in the Garza case issued by this court in 2019. One in which the appearance of a threat or a possibility that a subject could be retrieving a weapon requires or makes reasonable the use of deadly force to protect the officer and potentially others who might be endangered by the possible retrieval of that weapon. And it's a second by second analysis. The timeline is significant. And in a situation like that, which I think is also something discussed in the Reese case that this court issued in 1991, the officer is not required by the Fourth Amendment to, at that point, wait and see what happens or to try to de-escalate the situation. If there's an imminent threat of serious harm, if the officer reasonably believes that their life is in danger, at that moment, a further warning is not feasible. And that's why it doesn't violate the Fourth Amendment that a further, more explicit warning was not provided after Ms. Pachukova reached Forte Weston. He was though, straightening out on the fact, he was by that point had moved, shielded by the door? He was crouching behind, he testified in his deposition that he opened his driver's side door and was crouching behind it and was partially concealed behind it. That's correct. So how does that factor into this, his concern about safety? Well, I don't think that it ameliorates that danger entirely, first of all, because he's not entirely protected by a car door. And second, because I don't believe that there's any cases that this court has rendered in which that type of analysis comes into play. Mr. Green, it seems to me we have two things in front of us resolved by the district court. One is whether there was a constitutional violation. The other was just something clearly established that the officer wouldn't have known about, but nonetheless would be subject to. It seems to me just looking at it as a Fourth Amendment violation, there are several things troubling about this and your exchange or your responses to Judge Costa is some of them that also seems pretty well protected. There never was notice, specifically, if you reach for your waistband, I'm going to kill you. If you don't stop, I'm going to shoot you. I'm overstating it just a bit. It does seem to me that this example, maybe a lot of our cases never decide the constitutional issue and just decide the qualified immunity, but there's a fair chance that we would address the constitutional issue here since the district judge did. What do you make of as constitutional to have done what your client did, even with the facts that we've been discussing? Yeah, well, Your Honor, I believe that the Fourth Amendment standards that govern here are clear, and that's part of the reason why there has not been a great deal of discussion of qualified immunity in the party's briefing or in the district court opinion. There's a number of recent Fifth Circuit cases with closely analogous facts. For example, the Manish case from 2009 involved a similar situation where the officers encountered a subject who they didn't have reason to suspect of any criminal offense or any serious criminal offense, and the subject's activity just consisted of moving his arms around in a vehicle where he was encountered asleep and then reaching out of the officer's sight towards the floor of the vehicle. The reasonableness of using deadly force in that situation is clear from the fact that the subject could have been retrieving the weapon. Similarly, in the Salazar-Limon case, the subject had had a brief struggle with the officer who attempted to handcuff him, but then the struggle ended and the subject began to walk away from the officer, and it was as the subject then turned around and the officer believed the subject was reaching towards a waistband that the officer used deadly force. That also was reasonable under the Fourth Amendment because that reach for the waistband was a motion the officer reasonably thought could be consistent with retrieving a weapon. How important is the reaching for the waistband independent of the rest of this? I believe that that is a significant factor. That's the clearest indication in this case that Officer Davey or that Deputy Davey reasonably believed could have been retrieving a weapon. I'd also like to point out the Romero case, which is one in which the subject was stopped by an officer following an allegation of a burglary that the subject may have been involved in. In that case, the subject stepped out of his vehicle. There was some dialogue between the subject and the officer where the subject failed to keep his vehicle, but then the subject exited the vehicle and became compliant. The subject placed their hands in the air, but then slowly began to walk towards the officer, and that's a case in which the subject disregarded instructions to stay where he was, but otherwise kept his hands visible. I believe the only evidence in that case was that regarding hand movements, he may have been touching his hat as he had his hands on his head. In that case, the use of deadly force was reasonable based on the approach alone. One thing Romero brings up, as you said, he was suspected of burglary, and that's one of the factors is what type of crime is the person suspected of committing. Here, it's really nothing. It was just stopping to breathe. It does make it a lot harder to believe that there's not impossible, but that there's going to be some violence. There's certainly no known history of violence by this person. That's absolutely right, Your Honor, and I think this case is similar to Manus in that respect and to Garza V. Briones in that respect. Those are cases in which the subject that the officer encountered wasn't necessarily suspected of any significant criminal activity in Manus. They were asleep in a vehicle that was parked on some railroad tracks. In Garza, the individual was sitting outside of a bar and holding a BB gun. I think what's significant in this court's cases and what makes the use of deadly force reasonable is not necessarily the commission or suspected commission of a criminal offense, but what this court has been saying in its cases is that a hostile and non-cooperative subject who makes motions consistent with reaching for a weapon, that that's what makes the belief that the subject may be retrieving a weapon reasonable and therefore makes the use of deadly force reasonable. Now, there's a lot of back and forth in the briefing in this case between appellant and appellee about how those other garnered factors apply in an analysis like this where, you know, it's a use of non-deadly force, and so we're not necessarily weighing the government's interest in obtaining the suspect of a particular criminal offense. What makes the force reasonable in this case is the threat that is suggested by the subject's activity. It's not the government's interest related to a criminal offense, and that's why whether or not the subject committed or is believed to have committed a particular offense doesn't really enter the Fourth Amendment analysis in the same way in a deadly force case because no criminal offense standing alone is sufficient to justify the use of deadly force. It's the threat that has to justify the use of deadly force. Mr. Green, why don't you address the explanation of the current, I don't want to suggest that it's been claimed all along, but the First Amendment claim? Yes, Your Honor, I would like to address that, and I think what's significant about that case, first of all, it's helpful to have the clarity that appellant is not arguing or does not appear to be basing that claim on the allegiance or the statement that is disputed in this case, which is whether or not appellant said you're going to die tonight at the same time that she reached towards her waistband. So I want to first point out the timeline of events with respect to that First Amendment claim. It is clear that appellant began using profanity and speaking provocatively at the outset of the encounter, and the temporal proximity between the adverse act, the use of deadly force, and those statements just isn't there. Deputy Davey, to put it simply, did not use deadly force against appellant when she began speaking in that way and making those statements. Those statements were not what provoked the use of deadly force. It was the motion that provoked the use of deadly force, and what's especially significant here is that the Supreme Court's 2019 opinion in Nieves, in the earlier 2006 opinion in Hartman, have made clear that going back to the Mt. Healthy opinion from the 70s, if there's an independent basis for the adverse action, the First Amendment retaliation claim isn't viable. And so this interrelates with the Fourth Amendment claim in part. If there was a reasonable basis for Deputy Davey to use deadly force, and that force is justified, you know, it doesn't become viable to argue that there was nonetheless a but-for clause between First Amendment protected speech and that use of force. If Deputy Davey had an independent justification for taking that action, then it's not First Amendment retaliation that's cognizable, because there's not a but-for causal link between the protected speech and the adverse act. Finally, Your Honor, one question about the officer fired five rounds, and a Becker case suggests that firing multiple rounds can create an issue of excess force. What do you say to that? Yes, Your Honor, I think that's an important question, and it's another question with which I believe the timeline of events is extremely significant here. In the video recording, which captures the moment in which the shots were fired, all five shots occur within the span of about one and a half seconds. And it is also visible in the video recording that once Ms. Pachucoba is visibly incapacitated, the shooting ends. And that relates, I think, to this Court's 2019 opinion in the Carza case. It's particularly addressed in footnote four of that opinion, where the Court is noting that if there is a basis for an officer to reasonably use deadly force, it is less significant whether they fire one shot or two shots or five shots. What is significant is that the use of deadly force doesn't continue after the threat has been neutralized. And that's not what happened here, and there's no evidence to suggest that it did. And so for that reason, I don't think there's an issue about an unreasonable number of shots that were fired. If deadly force is justified, it continues to be justified until the threat has ended, regardless of the number of shots that occur in that period. And I see that my time has expired, so unless there are any questions, I think that's all I'm going to have this morning. All right, thank you, Mr. Green. You have, I believe, five minutes for a rebuttal. Thank you, Judge Southwick. First, I want to address a few points that Mr. Green made. Number one, the objective versus subjective test, that's meant to make it a stronger test, not a weaker test. The point of that is to say that you're not allowed to just kill somebody and say, well, I was scared because look at that scary pair of shoes he's wearing, which is completely ridiculous and subjective. There has to be an objective component. To say that an officer who knows, who literally knows that there's no threat unless certain things are present, to then say, well, even though he knew this wasn't a threat, an objective person would. So therefore, even though this guy knew it wasn't a threat, he's allowed to kill this woman. It just doesn't seem to make sense. Another point that he made is the non-cooperative subject. This was not a subject. This was rendering aid. Again, a very funny way of rendering aid, but rendering aid, she was not under arrest for burglary. She was not being detained for anything. He was supposedly there to help, which is what we want our police to be there for. The biggest thing, I think, is two points. And number one is Mr. Green said it's undisputed that her hand went behind her back. That's not true. That is disputed. What's not disputed is that she reached towards her waistband. Not that her hand went behind her back. In fact, that's something that is disputed, whether or not her hands were behind her back or in front of her back. How does she dispute it? It's one thing that she didn't admit it and that the omissions that are involved here, how is it disputed? She testifies that she had her fingers up and that she was also holding a cigarette. So his own, again, we got to kind of put the testimony together in conjunction with that request to admit. Number one, his own testimony is he could see the cigarette. Number two, she said she was giving him the finger right before she got shot. So her hand, you can't give somebody the finger in front of, you know, you could have your finger up and reach for your waistband, so you can put it all together. But it is certainly disputed that she reached behind her back. That was not one of the requests to admit. It wasn't. And that's not something that was testified to. Mr. Doege may have claimed that, or Daigie. Thank you. You don't have much time. You can move on. Thank you. So that is obviously a disputed component. As far as, you know, seeing a gun and knowing that he had a gun out, anybody who's ever looked at headlights at nighttime, you can't see anything. He didn't say he had a gun. She didn't say she saw a gun. He didn't announce that he had a gun. If he would have said, I have a gun, that would have been a warning. When Judge Southwick, you asked Mr. Green about a warning, and his answer was something to the warning. At least that's what I kind of jotted down. I thought that's what his answer was. If it wasn't, I apologize. You look bewildered by my response. So if I'm getting it wrong, I apologize. But that's what I thought he said. And my only response to that is, there's no evidence that she knew there was a gun there. Again, her testimony is, she gave him the finger and then heard boom, boom, boom, boom, boom. I'm sorry. She heard boom, boom, boom. She said three booms, page 62 of her transcript. And then the last thing is moving towards the vehicle and reaching towards the waist. The question is when, in conjunction to being shot, those two things happened, assuming they did. And again, that's not something that's been in the request to admit. It's not something that's been testified to. The question here is, and this is something again, that my client disputes. My client says she was walking towards the car and then stopped between the cars. So that's not even really, it's just that she wasn't walking towards him while he shot her. The question here is, how soon before getting shot does that happen? And that's extremely important because this court, again, in Little versus Bexar County, a 2009 Fifth Circuit case, says that an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. Also Abraham versus Raso, R-A-S-O, a 1999 case, passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect. Something that the record is devoid of from the defendant's perspective, from our perspective it's not, is how soon before these two things happened, he shot her. If she reaches towards her waistband and five minutes later he kills her, that's insane. And there's nothing in the record from the defendant's perspective that puts it right Concluding point here, and that is that I touched on this before. I argued it perhaps a little bit too emotionally, but this is something that I think should be close to all of our hearts. And that is that we need to hold law enforcement accountable. I understand that I'm in the Fifth Circuit and I'm in Texas, but at some point in time, we have to look at officers and say, this is too much. This is just too much. You pull up behind a woman who did nothing wrong. She doesn't have a weapon on her. She doesn't threaten you. You lie and say she did. And then you get to kill her. It has to stop. It just has to stop. Unless there are any other questions for me, I see I'm out of time. All right, Mr. Madden, Bradner and Mr. Green, thank you for assisting us with this case. Well done to both of you. Thank you.